UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:26-cv-09121-MWC-DFM Date: August 28, 2026

Title: Etinosa Osahon v. Markwayne Mullin, *et al.*

Present: The Honorable Michelle Williams Court, United States District Judge

| T. Jackson | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings: (IN CHAMBERS) ORDER DISMISSING HABEAS-RELATED CLAIMS; CONVERTING ACTION TO CIVIL ACTION; GRANTING PLAINTIFF ETINOSA OSAHON'S (A No. 055-039-712) *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE (DKT. [2]); ORDERING RESPONDENTS TO SUBMIT DECLARATION RE: PETITIONER'S CUSTODIAL STATUS AND RESPOND IN WRITING TO OSC; AND SETTING HEARING ON ORDER TO SHOW CAUSE**

Before the Court is Petitioner Etinosa Osahon's ("Petitioner") *Ex Parte* Application for Temporary Restraining Order ("TRO Application") requesting the Court (1) issue a TRO enjoining Respondents[1] from taking any action to effectuate, procure, encourage, facilitate, or acquiesce in Petitioner's removal or transfer to Nigeria; (2) order Respondents to preserve all records relating to Petitioner's detention, transfer, and removal; and (3) issue an Order to Show Cause ("OSC") as to why a preliminary injunction should not issue requiring Respondents to facilitate Petitioner's return to the United States. *See* Dkt. # 2 ("*Appl.*") at 10–11. Respondents filed a response, arguing that because Petitioner concedes that he was removed in May 2026, he "cannot maintain a habeas claim to challenge his removal" and his Petition is therefore moot. *See* Dkt. # 10 ("*Opp'n*") at 2–3.

[1] The habeas petition and TRO Application list Respondents as: Markwayne Mullin (U.S. Secretary of Homeland Security); David J. Venturella (Senior Official Performing the Duties of the Director U.S. Immigration and Customs Enforcement ("ICE")); Thomas Giles (Field Office Director of ICE Enforcement and Removal Operations, Los Angeles Field Office); Todd Blanche (Acting U.S. Attorney General); Marco Rubio (U.S. Secretary of State); the U.S. Department of Homeland Security and U.S. ICE agencies; and the United States of America. *See* Dkt. # 1 ¶¶ 42–48; Dkt. # 2 at 1.

The Court issued a standing order on August 17, 2026, setting a briefing schedule on Petitioner's Application. *See* Dkt. # 10. For the reasons set forth below, the Court **DISMISSES WITHOUT PREJUDICE** Petitioner's habeas-related claims and **CONVERTS** this action to a civil, non-habeas matter. The Court further **GRANTS** the TRO Application (Dkt. # 2) and **ORDERS** Respondents to show cause, in writing, no later than **12:00 p.m. on Thursday, September 3, 2026**, as to Petitioner's whereabouts and, in a separate filing, why a preliminary injunction should not issue. The Court further **SETS** an Order to Show Cause, in person, for **Friday, September 4, 2026, at 1:30 p.m.** in Courtroom 6A.

## I. Background & Procedural History

The Petition details that Petitioner is a forty-nine-year-old native and citizen of Nigeria, who was admitted to the United States as a Lawful Permanent Resident ("LPR") on or about May 10, 2002. *See* Dkt. # 1 ("*Pet.*") ¶¶ 41, 61.

### A. Petitioner's Deferral of Removal Under the CAT

After receiving LPR status, Petitioner was convicted in federal court of offenses arising from a scheme involving stolen mail, bank fraud, and aggravated identity theft. *Id.* ¶ 62. On November 9, 2010, the U.S. Department of Homeland Security ("DHS") filed a Notice to Appear ("NTA") with the Lancaster, California Immigration Court, charging Petitioner as removable under Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA"). *Id.* ¶ 63. Petitioner applied for asylum, withholding of removal, and withholding and deferral of removal under the Convention of Torture. *Id.*

On February 2, 2012, the Lancaster Immigration Court ("IC") issued a Decision and Order ("IC Order") that made the following findings of fact and conclusions of law:[2]

---

[2] The Court *sua sponte* judicially notices "the existence of [the Immigration Court's] decision—which includes the stated reasoning of the authoring court as well as the date of the decision—and other filings made in the case, but not the facts recited in that decision or other filings." *Witzke v. Idaho State Bar*, 643 F. Supp. 3d 1093, 1104 (D. Idaho 2022); *GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F. Supp. 3d 1007, 1019 (C.D. Cal. 2017) ("A court may also take judicial notice of the *existence* of another court's opinion or of the filing of pleadings in related proceedings; the Court may not, however, accept as true the facts found or alleged in such documents.") (emphasis in original); *see also Antonio v. Chestnut*, No. 2:26-cv-01134-TLN-

1. First, the IC concluded that Petitioner's conviction for stealing and possession of stolen mail in violation of 18 U.S.C. § 1708 was an aggravated felony as defined at INA § 101(a)(43)(G), which made Petitioner removable under INA § 237(a)(2)(A)(iii);

2. Second, the IC found that DHS established by clear and convincing evidence that Petitioner's convictions for bank fraud and aggravated identity theft caused a loss in excess of $10,000, making Petitioner removable as an alien convicted of an aggravated felony under INA § 237(a)(2)(A)(iii);

3. The IC next concluded that because of Petitioner's convictions, he was ineligible for humanitarian asylum, withholding of removal under INA § 241(b)(3), or withholding of removal under the Convention Against Torture, 8 C.F.R. § 1208.16(c)(2); but finally, the IC found that,

4. Petitioner was eligible for deferral of removal under the Convention Against Torture, 8 C.F.R. § 1208.17(a) because the record established that Petitioner "was tortured twice in Nigeria, by government officials," and because of his membership in Boko Haram, Petitioner "was detained without trial and tortured"—he was "tied to a tree outside and forced to stare at the sun, and beaten and hung from the ceiling in an effort to extract a confession." The IC found that it is likely that Petitioner's return to Nigeria will be made known to

AC, 2026 WL 2110882, at *1 n.3 (E.D. Cal. July 22, 2026) (judicially noticing EOIR immigration court docket); *Salguero v. Nielsen*, No. LACV 17-03883-VAP (JEMx), 2018 WL 6930775, at *1 n.4 (C.D. Cal. Jan. 10, 2018). The Court does not judicially notice the facts recited in the IC Order, but recites them here only to the extent they apply to the IC Court's reasoning. *Witzke*, 643 F. Supp. 3d at 1104.

members of Boko Haram, who also beat and threatened Petitioner.

Ex. A to *Pet.*, Dkt. # 1-1 ("*IC Order*") at 10–19. The IC therefore denied Petitioner's Application for Asylum and Withholding of Removal under INA § 241(b)(3), ordered Petitioner to be removed to Nigeria, but granted Petitioner's Application under Article III of the Convention Against Torture ("CAT") for deferral of removal under 8 C.F.R. § 1208.17. *Id.* at 19. In its conclusion, the IC Order notified Petitioner, in part, that the deferral of removal "[d]efers removal only to Nigeria and does not preclude the DHS from removing [him] to another country where it is not likely [he] would be tortured." *Id.* Neither party appealed the IC Order, and the Order has never been terminated, modified, or reopened. *Pet.* ¶ 67.

B. Order of Supervision & Seizure

On April 30, 2012, ICE determined that Petitioner could be released from custody, and on May 2, 2012, ICE served Petitioner with a Release Notification, an Order of Supervision ("OSUP") on Form I-220B, and an Addendum to the Order of Supervision. *Id.* ¶ 68; *see also* Ex. B to *Pet.*, Dkt. # 1-2 (copies of ICE Release Notification, Order of Supervision, and Addendum to Order of Supervision). The OSUP requires, in part, that Petitioner: (1) "appear in person at the time and place specified, upon each and every request of ICE, for identification and deportation or removal"; (2) appear for medical or psychiatric examination at the expense of the U.S. Government, upon the request of ICE; (3) provide information under oath about his nationality, circumstances, habits, associations, and activities and other information as ICE considers appropriate; and (4) that he does not travel outside of California for more than 48 hours without first notifying ICE of places of such proposed travel. Ex. B to *Pet.*, Dkt. # 1-2 ("*OSUP*") at 6; *Pet.* ¶ 69.

On May 10, 2012, Petitioner reported to the ICE Los Angeles Field Office as directed. *Pet.* ¶ 70. For the next fourteen (14) years, Petitioner reported to ICE whenever required. *Id.* Petitioner never missed an appointment and ICE never cited Petitioner for any violation of any condition. *Id.* During those fourteen years, Petitioner married Fanta Osahon, a United States citizen. *Id.* ¶ 71. The couple has three United States children, ages thirteen (13), twelve (12), and eleven (11). *Id.* ¶¶ 41, 71. The family lives in Los Angeles County. *Id.* ¶ 71.

On February 18, 2025, Petitioner reported to ICE, as required. *Id.* ¶ 72. ICE issued Petitioner a Form I-220R receipt confirming his appearance and setting his next reporting

date as February 18, 2026. *See id.* ¶ 72; *see also* Ex. C to *Pet.*, Dkt. # 1-3 (copy of Feb. 18, 2025 Form I-220R). On February 18, 2026, Petitioner reported to ICE, as required; ICE set his next reporting date for June 12, 2026. *Pet.* ¶ 73.

On May 20, 2026, an automated ICE system sent Petitioner an electronic message captioned, "ICE Appointment Confirmation FOAS1604526." *Id.* ¶ 74; *see also* Ex. D to *Pet.*, Dkt. # 1-4 (copy of email directing Petitioner to report to ICE). The message directed Petitioner to report at 8:00 a.m. the following morning to the ICE Los Angeles Field Office. Ex. D to *Pet.*, Dkt. # 1-4 at 2. The email informed Petitioner that the "Estimated Duration" of the appointment was eight (8) hours, and asked Petitioner to bring "all documents given to [him] by CBP/BP Officer and bring passports, identity documents, or birth certificates etc. for everyone in [his] family [that he] entered with." Ex. D to *Pet.*, Dkt. # 1-4 at 2. The notice gave no reason for the appointment, did not mention a revocation of supervision, detention, removal, a country of removal, or anything about a right to consult counsel. *Pet.* ¶ 76; Ex. D to *Pet.*, Dkt. # 1-4 at 2. Because Petitioner was admitted as an LPR in 2002, neither Customs and Border Protection ("CBP") nor Border Patrol ("BP") Officers provided Petitioner with any documents, and Petitioner did not enter with family members. *Pet.* ¶ 77.

On May 21, 2026, Petitioner arrived at the ICE Los Angeles Field Office. *Id.* ¶ 79. An ICE Officer informed Petitioner that the purpose of the appointment was to update medical information in his file. *Id.* Petitioner had no reason to suspect the appointment was for a different purpose, and appearing in person upon each and every request of ICE was an express condition of Petitioner's OSUP. *Id.* Upon reporting to ICE, Petitioner was immediately taken into custody. *Id.* ¶ 82. ICE did not conduct a medical examination, did not conduct an appointment, and did not permit Petitioner to return home. *Id.* ICE confiscated Petitioner's wallet and telephone. *Id.*

Petitioner informed ICE Officers that he held deferral of removal status under the CAT and could not be returned to Nigeria. *Id.* ¶ 83. Petitioner requested to speak with an attorney, which ICE did not allow. *Id.* Petitioner was not served a notice of revocation of his OSUP, a statement of reasons for his revocation, a notice of intent to remove him to any country, an interview, an opportunity to respond to any reason for revocation, an opportunity to express a fear of removal to Ghana or to any other country, or any other form of oral or written notice. *Id.* ¶ 84. On that same date, the record shows that ICE procured a Warrant of Removal/Deportation for Petitioner's removal; Petitioner declined to sign the warrant. *See* Dkt. # 10-1 at 1–2.

That evening, ICE transported Petitioner to the Adelanto ICE Processing Center, where Petitioner was held in a processing cell until approximately 5:00 a.m. the next morning, on May 22, 2026, where he was then moved to general housing. *Pet.* ¶ 85. On May 22, 2026, Petitioner was given a brief telephone call. *Id.* ¶ 86. Petitioner called his brother, informed him where he was being held, and was told his family would visit the next visiting day. *Id.* ¶ 86. This was the last contact Petitioner had with his family until May 30, 2026. *Id.*

C. Petitioner's Deportation to Ghana

At approximately 6:00 p.m. on May 22, 2026, Petitioner was directed to pack his belongings and was moved out of Adelanto. *Id.* ¶ 87. Over the next few days, Petitioner was transported to Victorville, California, and from there, through Texas, Arizona, Louisiana, and then back again to Texas. *Id.* ¶ 88. Petitioner was not allowed to leave the aircraft and was held in restraints throughout the duration of the travel. *Id.* Petitioner was not allowed to shower or change his clothing and was not told where he was being taken. *Id.*

On May 27, 2026, Petitioner was transported by bus to an airport in Texas and then placed aboard an aircraft. *Id.* ¶ 89. An escort informed Petitioner that he was being flown to West Africa and that his destination was Ghana. *Id.* Petitioner protested and told the officers he could not be sent to Ghana as he feared removal there and held protection under the CAT. *Id.* ¶ 90. Petitioner was told that he could raise the matter with an immigration officer once he boarded the aircraft; however, no immigration officer was present on the aircraft. *Id.* No officer ever took his fear claim, and no screening interview ever took place. *Id.* Conditions aboard the aircraft were degrading. *See id.* ¶ 91. The aircraft stopped in Miami, Florida, then flew to Senegal, Cameroon, and then to Ghana on May 28, 2026. *Id.* ¶ 92.

Upon arrival in Ghana, Petitioner was handed over to Ghanaian authorities; he did not have a passport or travel documents and was detained for approximately two days. *Id.* ¶¶ 97–98. Petitioner's phone and property were withheld from him and he could not make calls or record his surroundings. *Id.* ¶ 98. On May 30, 2026, Ghanaian immigration officials placed Petitioner and others on a bus. *Id.* ¶ 99. Officials informed Petitioner that his final destination was Nigeria. *Id.* Petitioner immediately objected and told officials he could not be sent to Nigeria because he had protection under the CAT and that he would be killed there. *Id.* ¶ 100. Officials did not respond to his objection and did not stop. *Id.*

The bus did not proceed to a lawful point of entry, but instead, took the group across the border into Togo, on foot, through the bush, avoiding any official crossing point. *Id.* ¶ 101. Petitioner did not receive travel documents. *Id.*

Upon arriving at the Togolese side of the border, a vehicle was waiting for Petitioner and other detainees. *Id.* ¶ 102. The escorting Ghanaian officer instructed the driver to carry the group to Lagos, Nigeria, by way of Cotonou. *Id.* ¶ 102. Each member of the group was provided with Ghanaian cedis in an amount equal to 100,000 Nigerian naira, which they were told to use for transportation to their homes upon arrival in Nigeria. *Id.* ¶ 102. Petitioner refused to board the vehicle and told officials he would not go to Nigeria. *Id.* ¶ 103. Officials told him to "do whatever he wanted to do," and then departed, leaving Petitioner at the roadside of Togo, without documents, lawful status, or any means of returning to the United States. *See id.* Later that day, on May 30, 2026, Petitioner contacted his wife and brother for the first time since May 22; at that time, his family learned he had been removed from the United States. *Id.* ¶ 104.

Petitioner now remains in Togo, in hiding, without a legal immigration status, a residence permit, an authorization to work, the ability to speak French—the official language of Togo—or access to his family, friends, or community. *Id.* ¶ 105. Petitioner has contracted malaria and has been seriously ill, without access to medical care. *Id.* ¶ 106. Petitioner lacks lawful means of departing Togo for any destination other than Nigeria. *Id.* ¶ 107. Because Petitioner is an undocumented Christian convert and former member of Boko Haram, and because Respondents publicized Petitioner's identity on the social media platform "X" (*f/k/a* "Twitter"), Petitioner is not safe where he is, as Togo experiences sustained attacks by armed extremist groups, including groups affiliated with al-Qaeda. *Id.* ¶ 108; *see also id.* ¶¶ 93–96 (ICE publicizing Petitioner's identity on the platform "X").

On August 14, 2026, Petitioner filed the habeas petition, asserting four (4) causes of action for: (1) violation of the Fifth Amendment's Due Process Clause; (2) removal in excess of statutory and regulatory authority, in violation of 8 U.S.C. § 1231(b)(2), the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") § 2242, and 8 C.F.R. §§ 1208.17, 1208.18; (3) unlawful revocation of Order of Supervision, in violation of 8 C.F.R. §§ 241.4(l), 241.13(i); and (4) violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(1)–(2), 28 U.S.C. § 1361, and ICE Policy Directive 11061.1. *See id.* at 22–27. On that same date, Petitioner filed the instant TRO Application, requesting the Court issue an Order (1) to preserve the *status quo* and order Respondents to "take no step to effectuate, procure, encourage, facilitate, or acquiesce in Mr. Osahon's

transfer to Nigeria, and that they preserve the records of what they did"; and (2) issue an Order to Show Cause ("OSC") as to why a preliminary injunction should not issue requiring Respondents to facilitate Petitioner's return under their own written policy. *See Appl.* at 4–5, 10–11.

## II. Legal Standards

### A. *Ex Parte* Applications

"Circumstances justifying the issuance of an ex parte order are extremely limited." *Reno v. Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (quoting *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438–39 (1974)). "Consistent with [the Supreme Court's] overriding concern, courts have recognized very few circumstances justifying the issuance of an ex parte TRO." *Id.* (discussing parties' failure to provide notice under Fed. R. Civ. P. 65(b)).

In this District, *ex parte* applications are solely for extraordinary relief and are rarely justified. *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 490 (C.D. Cal. 1995). A party filing an *ex parte* application must support its request for emergency relief with "evidence . . . that the moving party's case will be irreparably prejudiced if the underlying motion is heard according to regularly noticed motion procedures," and a showing "that the moving party is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect." *Id.* at 492. "Ex parte applications are not intended to save the day for parties who have failed to present requests when they should have." *Id.* at 493 (internal quotation marks omitted).

### B. Temporary Restraining Orders

Federal Rule of Civil Procedure ("Rule") 65 grants district courts the power to issue injunctions and restraining orders. Issuance of a TRO, as a form of preliminary injunctive relief, is an extraordinary remedy, and the applicant for such a remedy bears the burden of proving its propriety. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). In general, the showing required for a TRO and a preliminary injunction are the same. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). The applicant for a TRO must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm absent the injunction; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 5, 20 (2008); *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024). "In the Ninth Circuit, a plaintiff may also prove a TRO is warranted by raising 'serious

questions going to the merits.'" *NML Cap., Ltd. v. Spaceport Sys. Int'l, L.P.*, 788 F. Supp. 2d 1111, 1125 (C.D. Cal. 2011) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011)). Where the non-movant is a government entity, "the third and fourth [*Winter*] factors . . . merge." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc).

## III. Discussion

### A. *Ex Parte* Application and *Mission Power* Factors

Petitioner has satisfied the *Mission Power* factors. Petitioner is in hiding in a foreign country without a residence permit or authorization to work. Petitioner contracted malaria, is seriously ill, and lacks reliable access to medical care. He does not speak the official language of Togo, has no connection to the area, is thousands of miles away from his family, friends, and community, and faces sustained risks to his safety as an undocumented Christian convert and former member of Boko Haram. *See Pet.* ¶¶ 105–07. If the Court heard the motion according to regularly noticed motion procedures, that would leave Petitioner in hiding in a foreign country for several more weeks, in worsening health. Considering the exceptional circumstances present, the Court finds that bringing this Application on an *ex parte* basis is warranted.

### B. Request for TRO and OSC

#### *i. Mootness*

In opposition to Petitioner's TRO Application, Respondents contend that because "Petitioner was physically removed from the United States and out of immigration detention ***before*** Petitioner filed this action," that Petitioner's habeas petition and TRO Application are both rendered moot under Article III. *See Opp'n* at 2–3 (emphasis in original). In support of this proposition, Respondents principally rely on the Ninth Circuit's decision in *Abdala v. I.N.S.*, 488 F.3d 1061 (9th Cir. 2007). *See id.* at 2–3 ("The facts of this case align exactly with those in *Abdala*, where the Ninth Circuit held that a habeas petition becomes moot when an immigration detainee is removed from the United States.").

In *Abdala*, however, the Ninth Circuit discussed whether removal of a detainee *after* the filing of a habeas petition and accompanying TRO Application moots the petition. *See*

*Abdala*, 488 F.3d at 1062–64. *Abdala* is therefore inapplicable to this case because ICE removed Petitioner to Ghana *before* Petitioner filed the instant habeas petition and TRO Application, not after.

In these scenarios—where a petitioner is removed prior to the filing of a habeas petition—the Court lacks jurisdiction to consider the petition:

> Section 2241 requires the petitioner to be 'in custody' at the time of filing for federal courts to have jurisdiction over a habeas petition. *See, e.g.*, *Abdala v. INS*, 488 F.3d 1061, 1063–64 (9th Cir. 2007). Smith falls squarely within our precedent: a non-citizen who has 'already been removed' prior to filing a habeas petition 'do[es] not satisfy the 'in custody' requirement of habeas corpus jurisdiction.' *Miranda v. Reno*, 238 F.3d 1156, 1159 (9th Cir. 2001); . . .
>
> . . . .
>
> We have long held that a petitioner 'cannot avail himself of habeas corpus jurisdiction' once he has been removed, because once removed, he is 'no longer in custody.' *Miranda*, 238 F.3d at 1158–59 (internal quotation marks omitted).

*Smith v. U.S. Customs and Border Prot.*, 741 F.3d 1016, 1019–20 (9th Cir. 2014); *see, e.g.*, *Emigdio-Neri v. Blanche*, No. 3:26-cv-02802-LEK-DEB, 2026 WL 1349067, at *1 (S.D. Cal. May 14, 2026).

Petitioner was not "in custody" at the time he filed this petition. Similarly, since Petitioner is currently in hiding in Togo, it does not appear that he is "subject to conditions that significantly confine and restrain his freedom." *Doe v. McAleenan*, 415 F. Supp. 3d 971, 976 (S.D. Cal. 2019). Given that, at the time he filed the instant habeas petition, Petitioner was not "in custody" under any meaning of the term, the Court is thus deprived of habeas corpus jurisdiction. *Smith*, 741 F.3d at 1019–20. But this does not end the case.

Some courts, noting that a petitioner's remaining constitutional and other statutory claims "may survive [a petitioner's] removal" allow a petitioner to "reassert[] [such claims] by filing a civil complaint." *See, e.g.*, *Emigdio-Neri*, 2026 WL 1349067, at *1; *see also Musaeva v. Cantu*, No. CV-25-04529-PHX-MTL (ASB), 2026 WL 172026, at *1 (D. Ariz.

Jan. 22, 2026) (dismissing remaining claims without prejudice to allow petitioner to re-file such claims as a civil rights complaint). However, dismissal and re-filing is not necessary. The Court has discretion to recharacterize a habeas petition as a civil rights action if the petition "is amenable to conversion on its face, meaning that it names the correct defendants and seeks the correct relief" and, specifically for *pro se* litigants, so long as the Court "warns the *pro se* litigant of the consequences of the conversion and provides an opportunity for the litigant to withdraw or amend his or her complaint." *Pinson v. Carvajal*, 69 F.4th 1059, 1075–76 (9th Cir. 2023); *Nettles v. Grounds*, 830 F.3d 922, 936 (9th Cir. 2016).

In his Reply brief, Petitioner characterizes the pending action as comprising *both* a habeas action and a civil action, stating, in relevant part, that "[t]he pleading is a verified § 2241 petition *joined with a civil complaint* for declaratory, injunctive, and mandamus relief. ECF No. 1 at 1. . . . Calling the entire action 'a habeas claim' does not dispose of the due-process, ultra vires, supervision-revocation, APA, and mandamus claims, each of which seeks declaratory and equitable relief that removal did not extinguish." *Reply* at 3–4 (emphasis added). Indeed, the Petition invokes not only this Court's habeas corpus jurisdiction pursuant to 28 U.S.C. § 2241, but also expressly invokes the Court's federal question jurisdiction under 28 U.S.C. § 1331, mandamus jurisdiction under 28 U.S.C. § 1361, and jurisdiction under the All Writs Act of 28 U.S.C. § 1651. *See Pet.* ¶ 13. And Petitioner is represented by counsel.

Given Petitioner's reliance on his non-habeas claims and the inclusion of such non-habeas claims in the Petition, the early stages of the case, that Petitioner is represented by counsel, and the needless delay and irreparable harm that would necessarily result if the Court ordered Petitioner to re-file this action as a civil rights complaint, the Court declines to dismiss this action without prejudice and order Petitioner to re-file the case. *Cf.* Fed. R. Civ. P. 1 (stating that the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.").

Instead, the Court **DISMISSES WITHOUT PREJUDICE** the habeas claims filed in the Petition and *sua sponte* **CONVERTS** this action to solely a civil action. The Clerk of Court is **ORDERED** to restyle this case as a non-habeas (e.g., non-194) civil action. General Order No. 26-05 (Dkt. # 6) no longer applies and, unless otherwise noted, all referrals to United States Magistrate Judge Douglas F. McCormick (Dkt. # 5) are **WITHDRAWN**. The Court proceeds to refer to "Petitioner Etinosa Osahon" as "Plaintiff"

and Respondents as "Defendants." Given the *sua sponte* conversion, the Court **ORDERS** that within fourteen (14) days of this Order, Plaintiff **SHALL** file either (1) an amended civil Complaint; or (2) an objection to the Court's conversion, accompanied with a notice of dismissal pursuant to Federal Rule of Civil Procedure 41(a), that Plaintiff intends to dismiss the action without prejudice and refile this case as a civil complaint.

*ii. Likelihood of Success on the Merits*

Turning to the TRO Application, the Court begins with the "[l]ikelihood of success on the merits," which "is the most important *Winter* factor[.]" *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal quotation marks and citation omitted); *Citibank, N.A. v. Mitchell*, No. 24-cv-08224-CRB, 2024 WL 4906076, at *3 (N.D. Cal. Nov. 26, 2024). "The likelihood of success on even just one claim is sufficient as long as that claim would support the injunctive relief sought." *Citibank*, 2024 WL 4906076, at *3 (citation omitted).

"Government agencies are required to comply with their own regulations." *Malik v. Noem*, No. 5:26-cv-00727-JAK (AYPx), 2026 WL 852215, at *3 (C.D. Cal. Mar. 2, 2026) (citing *Morton v. Ruiz*, 415 U.S. 199, 235 (1974)). Once a noncitizen is released under an OSUP, 8 C.F.R. § 241.13(i)(2) provides for its revocation if the noncitizen has violated a condition of the OSUP, or if "on account of changed circumstances, [ICE] determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2); *see also Malik*, 2026 WL 852215, at *2. "ICE's own regulations thus place the burden on ICE to show changed circumstances that make removal significantly likely in the reasonably foreseeable future." *Malik*, 2026 WL 852215, at *2 (quotation marks and citation omitted).

After an OSUP is revoked, the noncitizen is entitled to be "notified of the reasons for revocation of his or her release" and to have "an opportunity to respond to the release for revocation stated in the notification" through an informal interview "promptly" after his return to ICE custody. 8 C.F.R. § 241.13(i)(3). The noncitizen's opportunity to respond must allow the noncitizen to "submit any evidence or information that he or she believes shows there is no significant likelihood he or she be removed in the reasonably foreseeable future, or that he or she has not violated the order of supervision." *Id.* Further, the "revocation custody review will include an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release." *Id.*

Relatedly, 8 C.F.R. § 1208.17 affords a noncitizen granted deferral of removal under the CAT various procedural safeguards. *See* 8 C.F.R. §§ 1208.17(d). To terminate the deferral of removal, ICE must first "file a motion with the Immigration Court having administrative control pursuant to § 1003.11 of this chapter to schedule a hearing to consider whether deferral of removal should be terminated." *Id.* § (d)(1). The motion "shall be granted if it is accompanied by evidence that is relevant to the possibility that the alien would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing." *Id.* From there, the Immigration Court "shall provide notice to the alien . . . of the time, place, and date of the termination hearing." *Id.* § (d)(2). The notice "shall inform the alien that [they] may supplement the information in his or her initial application for withholding of removal under the [CAT] and shall provide that the alien must submit any such supplemental information within 10 calendar days of service of such notice[.]" *Id.* The Immigration Court then forwards a copy of the original application, and any supplemental information that the noncitizen submitted, to the U.S. Department of State. *Id.* The procedure concludes with a hearing and "de novo determination based on the record of proceeding and initial application in addition to any new evidence" as to whether the "alien is more likely than not to be tortured in the country to which removal has been deferred." *Id.* § (d)(3). The IJ then determines whether to terminate the deferral of removal. *Id.* § (d)(4).

Regarding Plaintiff's claim for violations of the Fifth Amendment's Due Process Clause, the Supreme Court has "long held," and recently reaffirmed, that "'no person shall be' removed from the United States 'without opportunity, at some time, to be heard.'" *A.A.R.P. v. Trump*, 605 U.S. 91, 95 (2025) (quoting *The Japanese Immigrant Case*, 189 U.S. 86, 101 (1903)). "Due process requires notice that is 'reasonably calculated, under all the circumstances, to apprise interested parties' and that 'affords a reasonable time to make an appearance.'" *Id.* at 94–95 (cleaned up) (citation omitted); *see also Malik*, 2026 WL 852215, at *4 ("Noncitizens have a right to meaningful notice and opportunity to be heard before being deported to a third country.") (quotation marks and citations omitted). "Failing to notify individuals who are subject to deportation that they have the right to apply for asylum in the United States and for withholding of deportation to the country to which they will be deported violates both [ICE] regulations and the constitutional right to due process." *Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999).

The present case is, unfortunately, strikingly similar to *Abrego Garcia v. Noem*, 777 F. Supp. 3d 501 (D. Md. 2025), *aff'd sub nom. Noem v. Garcia*, 604 U.S. ---, 145 S. Ct. 1017 (2025). As in *Garcia*, here, "[i]t is undisputed that [Plaintiff] was removed to

[Nigeria] despite a grant of [deferral] of removal to that country." *Garcia*, 777 F. Supp. 3d at 516. "Even more disturbing, the Defendants concede"—through their failure to raise any evidence or argument in opposition to the TRO Application—that they violated each and every regulation cited herein. *Id.*; *see also Opp'n*. Defendants failed to proffer or submit any evidence to demonstrate that they carried out *any* of the procedures to revoke Plaintiff's OSUP: for instance, that ICE showed a change in circumstances to make removal significantly likely in the future, that Plaintiff was notified of the reasons for revocation, and so on and so forth. *See* 8 C.F.R. § 241.13(i)(3). Nor is there evidence in the record to indicate that Plaintiff was afforded an opportunity to respond or submit evidence, or that ICE followed any of the procedures afforded Plaintiff to terminate his deferral of removal under the CAT.

The only evidence Defendants submitted to the Court is a copy of a May 21, 2026 Warrant of Removal/Deportation that Plaintiff declined to sign. *See* Dkt. # 10-1 at 1–2. That Defendants procured the warrant on the same date as Plaintiff's detention and removal is suspect. What is more troubling is the fact that Defendants failed to apprise Plaintiff of the reason underlying the May 21, 2026 appointment. *See* Ex. D to *Pet.*, Dkt. # 1-4. To the extent their email to Plaintiff the day before the appointment constitutes a DHS Notice, it "fails to provide [Plaintiff] with adequate notice of the reasons why [his] release was revoked, [which] violates federal regulations." *Kiwana v. LaRose*, No. 3:25-cv-3678-JES-SBC, 2026 WL 102661, at *2 (S.D. Cal. Jan. 14, 2026). "When a noncitizen is not informed of the reasons for which they were re-detained, it is essentially impossible for them to adequately respond to them and secure their own freedom." *Id.* at *3 (citations omitted).

Plaintiff's deferral of removal status prevented him from being deported to Nigeria, until and unless his deferral of removal was terminated. *See id.* at *4 ("An individual's deferral of removal can only be terminated through either the Government's successful undertaking of a lengthy re-litigation process[] or the occurrence of one of two highly unlikely events.") (internal footnotes omitted) (citing 8 C.F.R. §§ 1208.17(d)–(f)). Yet, Defendants appear to concede that, in flagrant violation of their own regulations and the Fifth Amendment's Due Process protections, they hastily deported him without any of the procedural protections outlined above. *See, e.g.*, *Garcia*, 777 F. Supp. 3d at 517 ("Defendants deprived Abrego Garcia of this right without *any procedural protections* due to him. Indeed, nothing in the record suggests that Abrego Garcia received any process at all. Accordingly, he is likely to succeed on the merits of Count II.") (emphasis in original).

Finally, though the Court need not assess Plaintiff's APA claim, the Court concludes that for the same reasons explained in *Garcia*, Defendants' actions were arbitrary and capricious under the APA. *See id.* ("An agency action is arbitrary and capricious when the agency disregards rules or regulations still in effect or departs from a prior policy without articulating a satisfactory explanation for its action including a rational connection between the facts found and the choice made."). Indeed, Defendants' Opposition brief does not "dispute that the decision was without any lawful authority whatsoever." *Id.* For all these reasons, the Court finds that Plaintiff is likely to succeed on the merits of his claims.

*iii. Irreparable Harm*

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "Obviously, the risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm." *Garcia*, 777 F. Supp. 3d at 518 (quoting *J.G.G. v. Trump*, 772 F. Supp. 3d 18, 42 (D.D.C. 2025)). The Ninth Circuit has also identified "irreparable harms imposed on anyone subject to immigration detention," including "less access to medical care in detention facilities, economic burdens on detainees and their families, and harms to children whose parents are detained" or removed. *Malik*, 2026 WL 852215, at *4 (relying on *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017)).

Here, the Immigration Court found that "it is more likely than not that upon returning to Nigeria, [Plaintiff] would be detained by officials and tortured again." *IC Order* at 18. The IC Court noted that before Plaintiff fled Nigeria, he was beaten and threatened by members of Boko Haram. *Id.* at 19. The Petition, construed as the Complaint, and the TRO detail the same concerns. *See, e.g.*, *Pet.* ¶¶ 1, 6–7, 10–11, 65. Petitioner fears returning to Nigeria, yet currently remains in hiding, alone, without able to speak the native language, without a residence permit, currency, or a community, and with malaria. *Id.* ¶¶ 83, 100, 105–07. Plaintiff has limited access to medical care, and is separated from his spouse and children. The Court finds that, as in *Garcia*, "the risk of harm shocks the conscience." 777 F. Supp. 3d at 518. Plaintiff adequately demonstrates irreparable harm.

*iv. Balance of the Equities and Public Interest*

As detailed above, the last two *Winter* factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). As to Defendants' interests, there is a compelling interest in the enforcement of the nation's immigration laws, but here, it appears Defendants admit to violating the law at every turn. *See Medina v. U.S. Dep't of Homeland Sec.*, 313 F. Supp. 3d 1237, 1252 (W.D. Wash. 2018). Still, the balance of equities and the public interest factors tip in favor of Plaintiff because he is challenging Defendants' likely violation of federal laws. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable or in the public's interest to allow the [government] . . . to violate the requirements of federal law." (citations omitted)); *Luu v. Bowen*, No. 5:25-CV-03145-MEMF-SP, 2025 WL 3552298, at *10 (C.D. Cal. Dec. 11, 2025) ("'Public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.'" (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005))); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (noting that the government "cannot suffer harm from an injunction that merely ends an unlawful practice"). And "[o]f course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009); *Garcia*, 777 F. Supp. 3d at 519.

Defendants failed to provide Plaintiff with an adequate Notice prior to his May 20, 2026 appointment, failed to explain the basis for revoking his OSUP, let alone follow any of the outlined procedures to either revoke his OSUP or terminate his deferral of removal, held him in detention centers without legal basis, failed to present him to any immigration judge or officer, and forcibly transported him throughout the country, and ultimately, to where he resides now in Togo. In short, the public interest and "companion equities" favor the requested injunctive relief. *Garcia*, 777 F. Supp. 3d at 519.

C. Bond Requirement

Rule 65 notes that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Despite the seemingly mandatory language, 'Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*.'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting

*Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (emphasis in original)). "In particular, the district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* (cleaned up). "That is, the mandatory language of Rule 65(c) does not 'absolve[] the party affected by the injunction from its obligation of presenting evidence that a bond is needed, so that the district court is afforded an opportunity to exercise its discretion in setting the amount of the bond.'" *Vaskanyan v. Janecka*, No. 5:25-cv-01475-MRA-AS, 2025 WL 2014208, at *8 (C.D. Cal. June 25, 2025) (quoting *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003)).

Since the Court is ordering Defendants to follow the governing law, bond is unnecessary. *See Swan v. Tanjuakio*, No. 21-00052 JMS-KJM, 2021 WL 1794756, at *8 (D. Haw. May 5, 2021) ("The court is simply requiring [defendant] to follow the law. No bond is required.") (footnote omitted); *Hassanzadeh v. Warden*, No. ED CV 25-2113-DMG (MAAx), 2025 WL 3306272, at *6 (C.D. Cal. Nov. 25, 2025) (ruling that bond was unnecessary where the court ordered respondents to release immigration detainee from custody and follow the governing law).

IV. Conclusion

For the foregoing reasons, the Court **ORDERS** as follows:

1. Plaintiff Etinosa Osahon's (A No. 055-039-712) *Ex Parte* Application for Temporary Restraining Order (Dkt. # 2) is **GRANTED**. Defendants are **ENJOINED** from taking further action to effectuate, procure, encourage, facilitate, or acquiesce in Plaintiff's removal or transfer to Nigeria. The Court further **ORDERS** Defendants to preserve all records relating to Plaintiff's detention, transfer, and removal.

2. Plaintiff's habeas-related claims are **DISMISSED WITHOUT PREJUDICE**. The Court **CONVERTS** this action to a non-habeas, civil action.

3. The Clerk of Court is **ORDERED** to re-style this case as a non-habeas civil case (e.g., non-194 case). General Order No. 26-05 does not apply to this matter, and the Court **WITHDRAWS** all referrals to U.S. Magistrate Judge McCormick unless otherwise noted.

4. Within fourteen (14) days of this Order, Plaintiff **SHALL** file either (1) an amended civil Complaint; or (2) an objection to the Court's conversion, accompanied with a Notice of Voluntary Dismissal pursuant to Federal Rule of Civil Procedure 41(a), indicating that Plaintiff intends to dismiss the action without prejudice and refile the action as a non-habeas civil matter.

5. By no later than **12:00 p.m. on Thursday, September 3, 2026**, Defendants are **ORDERED** to file a declaration from an individual with personal knowledge addressing the following: (1) the current physical location and custodial status of Etinosa Osahon; (2) what steps, if any, Defendants are taking to facilitate Etinosa Osahon's immediate return to the United States; and (3) what additional steps Defendants will take, and when, to facilitate his return. By the same date and time, **and in a separate filing**, Defendants are **ORDERED** to show cause, in writing, as to why a preliminary injunction should not issue. The declaration and the response to the OSC should be filed as separate docket entries.

6. The Court further **SETS** an Order to Show Cause in person for **Friday, September 4, 2026**, at 1:30 p.m. in Courtroom 6A. Remote appearances will not be permitted.

**IT IS SO ORDERED.**

:

**Initials of Preparer** TJ